

Lee S. Shalov (LS7118)
James P. Bonner (JB-0629)
Shalov Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, New York 10018
(212) 239-4340

GERSHON, J

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ AUG 0 5 2005 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

ARNOLD AND FRIMET ROTH, Individually and as Co-     :     CIVIL ACTION
Administrators of the Estate of MALKA CHANA ROTH,     :
Deceased, and as Next Friends for their minor children     :     CASE NO. _____
HAYA ELISHEVA ROTH, PESIA ROTH and RIVKA     :
ROTH; ZVI NEHEMIA ROTH; SHAYA ELAZAR     :
ROTH; and PINCHAS MOSHE ROTH,     :

                    :

        PLAINTIFFS,     :     **COMPLAINT**

                    :

   -against-     :

                    :

ARAB BANK, PLC,     :

                    :

       DEFENDANT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Plaintiffs Arnold and Frimet Roth, individually and as Co-Administrators of the Estate of

Malka Chana Roth, deceased, and as Next Friends for their minor children, Haya Elisheva Roth,

Pesia Roth and Rivka Roth; Zvi Nehemia Roth; Shaya Elazar Roth; and Pinchas Moshe Roth,

and each of them, by their attorneys, allege the following upon information and belief:

### NATURE OF THE ACTION

    1.    On August 9, 2001, 15 year old United States citizen Malka Chana Roth

("Malki") was murdered by a Palestinian suicide terror attack, planned and carried out by

HAMAS, at the Sbarro Pizza restaurant in the center of Jerusalem. Fourteen other innocent

persons were murdered in the same barbaric attack. Defendant Arab Bank, PLC ("Arab Bank")

knowingly provided material support and substantial assistance to those responsible for the terror attack and is therefore liable to Plaintiffs for the damages they have suffered.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333, 2334 and 2338, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 301 because, among other things, it continuously and systematically does business in the State of New York. Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank: (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York; and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from

international commerce. Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C.
§ 2334(a).

## THE TERROR ATTACK

5.      Just before 2 p.m. on August 9, 2001, a suicide bomber detonated a 10-20 pound
bomb packed with nails, screws and metal bolts in the crowded Sbarro pizzeria at the corner of
King George Street and Jaffa Road in downtown Jerusalem, within the State of Israel.

6.      Fifteen (15) people were killed, including at least 2 American citizens, in this
attack. Approximately 130 people were injured by the terror attack. The popular pizza parlor
was full of lunchtime diners, including many young children with families. The restaurant was
completely gutted in the massive explosion.

7.      The suicide bomber was Izz Al-Din Shuhail Ahmad Al-Masri, a terrorist acting on
behalf of HAMAS. Mahmoud Muhammad Ahmad Abu Hanoud al-Shouli ("al-Shouli"), a
commander of HAMAS in the West Bank, helped organize and plan this and other murderous
terror attacks for HAMAS.

8.      The Al-Masri family received at least two (2) payments on account of this act of
terrorism through and from Arab Bank. The first payment was from the Saudi Committee for the
Support of the Intifada Al Quds (see paragraph 38 below for details concerning the formation
and purpose of this Committee). The payment was for twenty thousand (20,000) Riyals, which
converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16), and
was designated as Receipt of Transfer No. 1195545058 in the Committee's records. The second
payment to the family was made to its Arab Bank account through the Al-Ansar charity, which
made arrangements with the bank manager of the local branch of the Arab Bank to deposit six
thousand dollars ($6,000.00) into the Al Masri family account. The parents of the terrorist told

NBC News on camera in May 2005 that soon after the bombing by their son they were told they would be compensated. "They told me to go to the Arab Bank and open an account and you will receive a salary." Almost immediately, Al Masri's father (Shuail Ahmad Al-Masri) began receiving about $140 per month. These payments continued for approximately 3 years! He personally went to the Arab Bank, as instructed, and was "given $6,000." The Arab Bank branch that gave the money to Al-Masri is shown plastered with posters glorifying the acts of suicide bombers in the NBC report of May 2005. On information and belief, Arab Bank also transferred money from the Saudi Committee to the family of al-Shouli who was considered by HAMAS a great and revered "martyr" after his death by Israeli security forces in November, 2001. The Palestinian Authority (the "PA") refers to this planner of the Sbarro terror attack as "Martyr #839" and describes him as Mahmoud Abu Hanoud, age 34, stating he was "assassinated" on November 22, 2001. *See* http://www.pnic.gov.ps/arabic/quds/eng/martyrs/ martyrs14.html.

9.    As recently as January 10, 2005, HAMAS activists at Bir Zeit University paid tribute to Al Masri as a champion of the Palestinian cause. The Palestinian National Authority web site proudly and publicly lists the terrorist as one of "The Martyrs" of the Al Aqsa Intifada, showing Izz Al Din Al Mussri, age 23, Martyr #601, died August 9, 2001 in a "Martyrdom operation." www.pnic.gov.ps/arabic/quds/eng/martyrs/martyrs11.html. He is the same person as Izz Al-Din Shuhail Ahmad Al-Masri, referred to above.

## THE ROTH FAMILY

10.    At the time of her death, Malki Roth was a citizen of the United States. Frimet Roth, the mother of Malki, is a citizen of the United States. Arnold Roth, Malki's father, is a citizen of Australia and Israel. Malki's 6 brothers and sisters join as Plaintiffs in this case as heirs and survivors of their sister Malki. They are Haya Elisheva, Pesia and Rivka, all of whom

are minors and bring this claim by their parents as Next Friends, and Zvi Nehemía Roth, Shaya Elazar Roth and Pinchas Moshe Roth. All of Malki's brothers and sisters are citizens of the United States. The Plaintiffs reside in Israel.

11.    Malki was born in the middle of her three older brothers and three younger sisters, one of whom, Haya Elisheva, is severely handicapped. Malki was extremely devoted and close to all her siblings, but especially to her sister, Haya Elisheva, who is now 10 years old. From the age of 14, Malki was an active, responsible and conscientious leader in a major youth organization where she served as a leader of girls of nine and ten years of age. In addition, she was personally involved as a volunteer in the care of seriously disabled children, including her own youngest sister and several girls of her own age who were mainstreamed into her high school. At the age of 14, for the entire summer, she volunteered as a "mother's helper" for a single mother with a terminally-ill child who lived near the Roth home in Jerusalem, Israel. Her last week of life was devoted to working as a volunteer camp counselor at a summer camp for special-needs children where the experience she had gained in her short life was invaluable in working with physically-challenged and intellectually-challenged children of her own age.

12.    Malki was also a gifted musician who played the classical flute. Malki's promising young life was ended on August 9, 2001 when she and her best friend, Michal Raziel, stopped for lunch at Sbarro's for a pizza on their way to an activity in a Jerusalem suburb. Malki and her friend, Michal, both died there, along with over a dozen others.

## DEFENDANT ARAB BANK

13.    Defendant Arab Bank, PLC is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange. Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian

holding company. Arab Bank and Arab Bank Group constitute a single Jordanian banking institution. Arab Bank owns, controls, and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department. Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York. The Bank does business in the United States and approximately 30 other countries on five continents and has over 7,000 employees. The Bank has an affiliate with over 100 branches in Saudi Arabia, Arab National Bank ("ANB"), and is a 40% shareholder of ANB.

14.    Beginning in approximately 1982, Arab Bank operated a federally chartered branch in New York. The New York branch was designated as a wholesale bank, and among the banking and financial services that it conducted in New York were the provision of clearing and correspondent bank services for its foreign bank branch offices and affiliated banking institutions as well as other foreign banks. The New York branch has approximately 50 employees working in or for the New York City operation. According to the Arab Bank Group's 2003 Annual Report, the New York Branch of Arab Bank clears all of the worldwide branches' dollar transactions in New York, New York, which includes the many transactions described below.

15.    On or about February 25, 2005, the U.S. Office of the Comptroller of the Currency ("OCC") announced drastic restrictions on Arab Bank's New York operations. The OCC determined that the branch "had internal control weaknesses, particularly with regard to its international funds transfer activities." The OCC also found that "the inadequacy of the Branch's controls over its funds transfer business is especially serious in light of the high risk characteristics of many of the transactions." www.occ.treas.gov/ftp/eas/ea2005-14.pdf. During

an investigative audit by the OCC of Arab Bank in late 2004 and early 2005, U.S. officials discovered, among other things, that Arab Bank had as customers 40-60 supported terrorists and terrorist groups with alleged associations to Al Queda, HAMAS, and Hezbollah and knowingly allowed such groups to transfer money through Arab Bank's New York branch at 520 Madison Avenue in New York City, in violation of the laws of the United States of America.

16.     Arab Bank and Arab Bank Group are majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who until his recent death was the Chairman of Arab Bank and Arab Bank Group, and Abdel Hamid A.M. Shoman, who is Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group. The Shoman Family founded the bank in Jerusalem in 1930. The former Chairman of the Board often made public remarks demonstrating his extremist anti-Israeli views. The Bank's current Chief Banking Officer is Shukry Bishara, who was responsible for the opening of the Bank's offices in New York in 1982 and who then moved to Ramallah in approximately 1994 to oversee the Bank's operations in the West Bank and Gaza. He was promoted to Chief Banking Officer and moved to Amman, Jordan only in February 2002.

17.     Arab Bank has consolidated assets of US$34 billion.    Arab Bank has approximately 22 branches operating in Gaza and the West Bank, the first of which was opened in late 1994 in Nablus. Since 1996, when the Israeli Central Banking Authority's supervisory role over Arab Bank's conduct in Gaza and the West Bank ended, the Palestinian Monetary Authority has had the duty to regulate the bank's branches in the Palestinian territories.

## **FACTUAL ALLEGATIONS**

### I.     **The Campaign of Terror by HAMAS**

18.     For the better part of the last decade, groups of Palestinian militants in the West

Bank and Gaza Strip have acted with a united purpose to eradicate the State of Israel through a campaign of terror conducted against innocent civilians in Israel and elsewhere. One such group is known as HAMAS.

19.    Arab Bank has provided explicit and tacit assistance and support to HAMAS (The Islamic Resistance Movement), including the material support detailed below, that contributed to and makes Arab Bank responsible for the terror attack that is the subject of this action.

20.    HAMAS is a radical Islamist terrorist organization committed to the globalization of Islam through violent "Jihad" or holy war. HAMAS is formally committed to the destruction of the State of Israel, is extremely anti-American and is committed to achieving its objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. HAMAS propaganda since the September 11th World Trade Center attacks has praised and glorified Osama bin Laden and his supporters engaged in global jihad. HAMAS, directly and through its network of "charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and the State of Israel and to incite and commit violence against them. HAMAS uses a network of alleged "charitable committees" to establish and maintain schools, camps, clubs and mosques to spread and incite hatred and violence against Jews and Christians living or visiting Israel.

21.    HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement. The organization was founded in December 1987 as an outgrowth of the Muslim Brotherhood. It is a terrorist organization that has intentionally killed thousands of innocent civilians, including Malka Chana Roth.

22.    The organization is nominally divided into two separate wings, the political wing that supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole. These wings recruit cells to commit the violent attacks HAMAS believes will help it achieve its political and religious objectives.

23.    HAMAS' social services are, in large part, administered by local "zakat" committees and other "charitable organizations" ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees, a fact well known to Arab Bank.

24.    Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, and are used to free up other funds for specific terrorist acts. HAMAS uses such funds for, among other things, the provision of material support in the form of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.

25.    Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of thousands of individuals, including over twenty (20) mass murders that have killed more than three hundred (300) civilians. The victims of those attacks include numerous American, British, Danish and Israeli citizens.

26.    HAMAS was designated by the government of the United States as a Specially Designated Terrorist Entity as far back as January 25, 1995. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the Anti-terrorism and Effective Death Penalty Act (the "AEDPA"). The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

## II.    The Al Aqsa Intifada or Intifada Al Quds

27.    Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

28.    This explosion of violence was widely termed the so-called Al Aqsa Intifada or Intifada Al Quds. Al Aqsa is an Islamic mosque located in Jerusalem; the term Intifada has generally been used to describe a violent uprising; an Intifada Al Quds is believed to refer to the violent uprising in the battle by Islamic terrorists to take the whole of Jerusalem from the people and citizens of the State of Israel. This was not the first series of violent acts against Israel, Israelis, Jews, and visitors to Israel. However, this new Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism. Whereas the number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 23,000 attacks. These attacks have claimed more than 8,000 casualties, including over 800 civilian deaths. These indiscriminate acts of violence have likewise resulted in the deaths of at least 40 U.S. citizens and caused serious bodily injury to scores of others.

29.    HAMAS often uses bombs to kill and maim people in its terror campaign. The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those individuals who happen to be inside the blast radius, causing cruel and horrific injuries. This was the case with the bomb used by the HAMAS operative at the Sbarro pizzeria. HAMAS has even used or at least discussed using rat poison or AIDS infected fluids to enhance the destruction, death and devastation. HAMAS terrorists often wear suicide bomb belts, and detonate the bombs in a method designed to cause death or injury to the maximum number of people in the vicinity of the bombing site. The suicide bomber is regarded by HAMAS as a "martyr" (or "Shahid" in Arabic).

30.    The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel, and of the United States and other democratic countries, and attempting to influence the policy of the Israeli government, and of the United States government, by attempting to compel Israel to withdraw from territory it presently controls, including Jerusalem, which is the capital of the State of Israel.

31.    The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

A. The Intifada, from its inception, was marked by a massive escalation of violence that quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

B. The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

C. The main rival terrorist groups, including but not limited to HAMAS, PIJ, PFLP and The Popular Resistance Committees, began cooperating and coordinating their activities.

D.  Saudi and other foreign financial support for the terrorist groups coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

## III.  Arab Bank's Conspiracy to Finance Palestinian Terrorism

32.    In the fall of 2000, Arab Bank knowingly joined into a conspiracy to aid and support the terrorism of the Intifada.  The attack that killed Malki Roth was one of the overt acts of that conspiracy.

33.    In 1984, the Shoman family that owns and controls Arab Bank PLC published a biography of Mr. Abdulhameed Shoman (the bank's founder), entitled *The Indomitable Arab*, in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel.  He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

34.    Prior to the establishment of Arab Bank, its founder, Abdulhameed Shoman, described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography, he is quoted as saying that within a few years Zionism will have grown strong enough to control the entire economy.  "I believe that all business dealings with the Jews — buying, selling or banking transactions — are damaging to our country's best interests."

35.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

I liked the Americans.  I once bore their nationality, and gathered my fortune in their country.  But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them.  It was not the Jews, but the Americans, who fought us.

36.     Until his recent death in July, 2005, Mr. Shoman's son, Abdul Majeed Shoman, was the chairman of the Arab Bank and a vocal supporter of the Intifada. The new chairman of the board succeeding him is Mr. Shoman's grandson, Abdul Hamid Shoman.

37.     Abdul Majeed Shoman was, for example, both the chairman of the Arab Bank and the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the first Intifada in 1987-1988. The Committee, in furtherance of its campaign of terror, and in support of those who committed violent terrorist acts, including maiming and murder, managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000, for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of "martyrs" of the first Intifada.

38.     A meeting of the Arab League was held in Cairo, Egypt in October of 2000. At the meeting of the Arab League, it was agreed, with the knowledge and participation of Defendant Arab Bank and its Bank Chairman, Abdul Majeed Shoman, that a financing distribution network or mechanism was needed to fund and fuel Palestinian terrorism in order to achieve various political, territorial and nationalistic goals. On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan. Arab Bank, directly and through its affiliate, ANB, has provided extensive banking and financial services to and for the benefit of the Saudi Committee with the knowledge that it was collecting, raising, transferring and distributing funds for the benefit of HAMAS and other Palestinian terror organizations.

39.    On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, then the Chairman of the Palestine Liberation Organization and the President of the Palestinian Authority, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the campaign of terror and murder that has become commonly known as the Intifada.

40.    Defendant Arab Bank pledged $2,000,000.00 and thus provided material support to the conspiracy and to the plan, scheme and design of terror.

41.    Abdul Majeed Shoman pledged $500,000.00, personally, and thus similarly provided material support to the conspiracy and the plan, scheme and design of terror.

42.    The Shoman family's support of the terrorist Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The express purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their "martyrdom". The exhibit fostered hatred against Israel, the Jewish people and the United States.

43.    The Arab Bank actively participated in the design and scheme to provide a method of distribution of monies to martyrs and their families, using the Bank's vast financial services network and resources, including its affiliate in Saudi Arabia, its branches and operations within the Palestinian territories, and its New York branch. By engaging in that conduct, Arab Bank advanced the conspiracy, plan, scheme and design to fund terrorism and to provide incentives and rewards to those who would, or did, murder and maim. Accordingly, the

Arab Bank's financial and ideological support for the terrorist Intifada, which is a matter of public record, and its participation in diligently implementing the universal terrorist death and dismemberment "insurance" scheme is knowing and deliberate and constitutes the providing of material support and financial services to terrorist organizations and to terrorists themselves. By its acts, Defendant Arab Bank knowingly, willingly and substantially assisted in the recruitment of terrorists and in the providing of material support, incentives and rewards for murder and maiming.

44.    According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families -- the families of the martyrs and the injured Palestinians and the disabled."

45.    The Saudi Committee decided to bestow financial support to the martyrs' families and to call upon the Jordanian government to make the donations tax-exempt. Abdul Majeed Shoman, the then Chairman of the Arab Bank, opened a meeting to support the Intifada by saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and the bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available, nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

46.    Mr. Shoman, as the Chairman of the Bank, objected to officially and physically locating the committee's office in Arab Bank's Amman headquarters building, but he left open the possibility of "loaning" an accountant from the bank to the committee.

47.    Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

48.    As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would make financial donations to Palestinians injured during the Intifada.    Employees of Defendant Arab Bank donated 5% of their monthly salary to the Palestinian cause and campaign of terror.  All of this activity was conducted publicly in Jordan.

49.    The Saudi Committee constitutes a professional fundraising apparatus intended to subsidize and provide material support to the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and other terrorist organizations and their related charitable front organizations in the West Bank and Gaza.  Those facts were known to Defendant Arab Bank, which knowingly and willfully joined with the Saudi Committee in furtherance of the conspiracy, scheme, plan and design to fund the campaign of terror against Israel, the Jewish People, and those who supported Israel, including the United States and its citizens.

50.    These goals are accomplished in several ways, all of which depended on the knowing participation and substantial assistance of the Defendant Arab Bank.

51.    Defendant, the Saudi Committee, HAMAS and other terrorist organizations provide a comprehensive "insurance benefit" of 20,000 Saudi Riyals, or approximately $5,316.06, for the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed.  The lump sum initial payment is often followed with lesser monthly payments.

52.    Benefits (less than for when a terrorist is killed) are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

53.    The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, the families of

Palestinians wounded during violent confrontations with Israel's security forces and those operatives held in Israeli custody. This type of support is critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure capable of solidifying HAMAS' position within Palestinian society. According to a sworn declaration of the Chief Banking Officer of Arab Bank, PLC made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000." According to *The Wall Street Journal,* citing account data, the New York branch of Arab Bank was involved in the transfer of more than $20 million to or from more than 45 supported terrorists or terrorist groups.[1] The HAMAS terrorist who murdered Malki Roth and so many others at the Sbarro pizzeria "earned" for his family thousands of dollars from the Saudi Committee via the knowing assistance and active involvement of the Arab Bank.

54.    Defendant Arab Bank knowingly and willfully administers this comprehensive terrorist finance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage," including for the family of those committing terror attacks, like the terrorists who killed Malki Roth.

55.    Arab Bank actively and knowingly participates in a formalized process that requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

56.    Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other

---

[1] *The Wall Street Journal,* April 20, 2005.

information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their "charitable" front organizations.

57.   Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens an account in United States Dollars ("dollar account") for each beneficiary. Every Palestinian family eligible under this universal coverage plan is encouraged and enabled to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

58.   If they choose to collect the "insurance benefit", the families are required to present to the bank their "official" certification from the Palestinian Authority establishing the bona fides of the martyr.

59.   If the documentation proves satisfactory upon examination by an agent, employee or officer of Arab Bank, at one of its branches, Arab Bank issues a receipt to the designated recipient of the martyrdom "insurance benefit." For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS. He was designated Palestinian Authority Martyr No. 449. The PA's web site lists him (Deya Al-Taweyl, age 24) as dying in a "Martyrdom operation." His father, Hussein Mohamed Favah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah. Arab Bank also knowingly distributed money to the parents of the HAMAS suicide bomber who killed scores of people, including Malki Roth, at the Sbarro Pizza restaurant in August of 2001.

60.   A recent report from the web site of the Saudi Committee describes the mechanism of the donations and the transfer of the money:

The Mechanism of delivering relief:

1.  Assessment study of the Aids-relief inside Palestine
2.  Choosing the Programs that help in achieving the Aims and goals of the Committee
3.  Exploring How to deliver Aids-relief to beneficiaries
4.  Choosing some recommended Palestinian personalities for Follow-up
5.  Setting a Coordination council in Gaza and West Bank
6.  Listing names of beneficiaries of Committee programs and completing and revising the information
7.  Studying names of beneficiaries and opening files for them for taking the needed procedures later
8.  Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
9.  **Opening accounts for each beneficiary in the branches of Arab Bank in Palestine**
10. Transferring Money for each beneficiary and notifying them

(http://www.alquds-saudi.org/static/mechanism.htm):

61.     Employees of the Arab Bank in the Palestinian territories know the role of each of these families in terrorist activity, and indeed are required to know of such activity in order to distribute monies to the terrorist "martyrs" and their families.

62.     In addition, the website section dealing with the Arab Bank Palestine branch reflects certain direct financial donations of Arab Bank for "Palestinian community projects." These payments reveal the Arab Bank's clear role in supporting the violence against civilians. Among the donations listed are:

- 17/8/2004 - Mandella Organization/Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children with school bags as well as stationery, aiming to help and support them and their children with their suffering

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University.  The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners

- Arab Bank sponsored the event of recognizing the mothers of Martyrs and Prisoners in Al Amari refugee camp. The event was organized by the Women Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

63.    The Bank explicitly acknowledges its support of "mothers of Martyrs and Prisoners," showing its direct involvement with, support of, and activities in assisting families of terrorists.

64.    The conspiracy between Arab Bank, the Saudi Committee, HAMAS and others is ultimately designed to, has heretofore, and does in fact provide substantial material support to Palestinian terrorist organizations, especially the largest Islamic terror organization, HAMAS, and other terrorist and front organizations. The payments made pursuant to the conspiracy provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

65.    The Defendant was and is aware of the methods and means by which the terrorist organizations seek to carry out their objectives. In fact, Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's former Chairman, Abdul Majeed Shoman, and others in leadership positions at Arab Bank, who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the Al Aqsa Intifada.

111766v1                                                    20

66.     In a published report in July 2000 in the Jordanian daily newspaper *Addustour*, Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

67.     A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour* stated that both the management and employees of Arab Bank were donating funds to support the Intifada, which was well known to include terrorism attacks.

68.     Accordingly, neither the ideology nor the actual conduct of the Arab Bank is passive or indifferent to the goals of, and means employed by, HAMAS and other Palestinian terror groups; rather, the Arab Bank is a knowing, willful and material participant in the terrorists' conduct.

69.     By further diligently implementing the "universal insurance" scheme, Defendant Arab Bank knowingly, willingly and substantially assists in the recruitment and support of terrorists.

70.     Any person who chooses to participate in a terrorist attack does so secure in the knowledge that, if he or she is killed or captured in the attack, the financial needs of his or her family will be met for some time. Such persons are virtually assured of receiving a substantial stipend if they are injured or detained incident to their performance of terrorist acts.

71.     One fifteen (15) year old boy captured by Israeli soldiers before he was able to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether he was promised anything in return for carrying out the attack. The boy responded: "Of course they did. They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money." It was well known to the HAMAS operatives in the period of 2000-2004 that the Arab Bank was acting as the "professional and reliable" provider of financial services and administrator of these

benefits for HAMAS and the Saudi Committee. The parents of the Hamas killer of Malka Roth received money from the Arab Bank to rebuild their house after their son's terror attack at the Sbarro Pizzeria. Those payments were an incentive and/or a reward for the murder of Malki Roth and for murdering and maiming the other victims of this cruel and heartless terrorist attack upon innocent civilians in the very heart of Jerusalem, in the State of Israel.

72.    In hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.

73.    The terrorists who planned, organized, committed and aided the attack that killed Malki Roth were eligible to receive money from the Arab Bank because of their terrorist act and such persons actually received money via the Arab Bank.

74.    In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to Defendant Arab Bank and its affiliate to fulfill its public pledge of universal "insurance coverage" to Palestinian terrorists.

75.    HAMAS uses "charitable fronts" to collect data on its own operatives as well as all other terrorists killed, injured or in Israeli custody and transmits the information to the Saudi Committee and Defendant Arab Bank.

76.    Through the program maintained, supported and administered by Arab Bank, the Saudi Committee paid death benefits to approximately 200 fallen "martyrs" in the first year of its

existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.

77.    Indeed, in its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the Internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

78.    Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine." The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

79.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report identifies the cause of death for each martyr.

80.    For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv, is listed as an illustrative martyr.

81.    Accordingly, there can be no confusion as to whether the "insurance plan" that Arab Bank maintained, supported and administered included the families of suicide bombers and no question that Defendant Arab Bank possessed knowledge of this fact.

82.    Defendant Arab Bank provides a convenient and efficient means for distributing this "universal coverage death and dismemberment benefit" across Palestinian controlled territories that would be far more difficult if attempted by other means, such as courier or the

delivery of money in the old gangland style: in suitcases or brown paper bags or bundled inside newspapers. As Israeli territory separates Gaza from the West Bank, and Israeli military checkpoints often separate one Palestinian city from another, the method and means of the transmission of money requires a financial institution with a vast network, employees, branches, influence, standing, willingness and ability to cause the delivery of money to terrorists through the use of the Arab Bank's accounts, branches, affiliates and employees.

83.    Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites and supports the terror campaign. The Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFT system of wire transfers, the exchange of foreign currencies into dollars, and the delivery of those United States dollars to terrorists, their families and their organizations to further their agenda and campaign of terrorism.

84.    Arab Bank knows the criminal purpose that the accounts it, and/or its affiliates, open and maintain for the Saudi Committee and the transfers it makes for the Saudi Committee, and for its terrorist bank customers, are intended to serve. Arab Bank has knowingly and intentionally joined with HAMAS, its "charitable front" organizations and the Saudi Committee in the above described financial distribution network with the goal, desire and objective of furthering HAMAS' and the other terrorist organizations' objectives to achieve their political goals through violent attacks against civilians in Israel, including Malki Roth.

85.    The Saudi Committee and local HAMAS "charitable" front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known

to Arab Bank and all of which are calculated to – and do – reach terrorists and potential
terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee
  published an annual report in which it listed the names of Palestinian prisoners to whom
  it provided terrorism benefits as well as the names of the Palestinian martyrs (including
  the names of those killed in suicide bombings) whose families received terrorism death
  benefits;

- In the November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi
  Committee placed an announcement listing the names of more than 1,000 individuals
  who had been injured during the Intifada or who were held in Israeli custody and invited
  them or their families "to go to the branches of the Arab Bank in their places of residence
  to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a
  HAMAS charitable front organization in Ramallah announced that the Saudi Committee
  "requests that the families of the martyrs whose names are listed herein go to a branch of
  the Arab Bank in their place of residence to receive the tenth payment offered by the
  Saudi Committee in the amount of $5,316.06 ...."

86.    Since the Saudi Committee raises its funds in Saudi currency, which cannot
conveniently be converted into Israeli currency (most commonly used in Palestinian controlled
areas), those funds are often converted into U.S. dollars through the New York branch of Arab
Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank was
aware that the Saudi Committee and a terrorist organization known as the Holy Land Foundation
("HLF") illegally raised or raises funds for HAMAS and other terrorist organizations. Despite
this knowledge, Arab Bank with the knowing assistance and participation of its Saudi affiliate
and worldwide branches, provided financial services and substantial assistance to these terrorist
organizations with the intent to aid, assist, support and abet HAMAS, the Saudi Committee, HLF
and other terrorist organizations, their fronts, and their terrorist members, recruiters, operatives
and activities, all of whom are committed to the use of murder and maiming of such victims of

terrorism such as Malki Roth. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2) important respects.

87.     First, Arab Bank provides both professionalism and transparency to the process thereby reassuring wealthy Saudi and other donors that the money they are contributing will not be siphoned off by corrupt Palestinian officials, but will in fact reach the families of terrorists as intended.

88.     Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

89.     By knowingly and actively participating in this process, scheme, plan and design, Arab Bank and its co-conspirators, including the Saudi Committee, HAMAS and others, have knowingly aided and abetted each and every terrorist act committed by their co-conspirators, including specifically the one that killed Malka Roth on August 9, 2001.

IV.    **Defendant Arab Bank Provides**
       **Material Support to Foreign Terrorist Organizations**

90.    Arab Bank knowingly provides banking services to HAMAS through the guise of "charitable" committees and affirmatively assists HAMAS in distributing funds to support the Intifada terror and hate campaign.    Throughout the Al-Aqsa Intifada, the Arab Bank has knowingly permitted various terrorist organizations and persons engaged in terrorism to solicit funds for their armed struggle over the radio, TV, and Internet and helped that endeavor by providing bank accounts and financial services to further the collection and distribution of funds for that purpose.

91.    Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut, which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS, which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

92.    The United States Department of Justice has identified the website: www.palestine-info.com[2] as the "official" website of HAMAS.  The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

93.    This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains directly.  Arab Bank also allowed Sheikh Ahmad Yassin, the well known and now deceased leader of HAMAS in Gaza, to use an Arab Bank account at its Gaza branch to collect money, to incentivize and to reward those hurt in the Intifada.

94.    In addition, Plaintiffs allege that the following entities are fronts, agents, instrumentalities or alter egos of HAMAS:

i.      Islamic Charity Association, aka The Islamic Charitable Society in Hebron;

ii.     Charity Committee in Ramallah, aka Ramallah Zakat Committee;

iii.    Jenin Zakat Committee, aka The Charity Association in Jenin;

iv.     Nablus Zakat Committee, aka Nablus Charitable Committee;

v.      Tulkarem Charitable Society, aka Tulkarem Zakat Committee;

vi.     Orphan Care Association (Bethlehem);

vii.    Qalqilia, aka Qalqiliyah Zakat committee;

viii.   Hebron Zakat Committee, aka Hebron Tithing And Alms Committee;

ix.     Halhul Zakat Committee;

x.      Al Aslah Association in el Bireh;

xi.     Al-Islah Charitable Society Association in Ramallah;

xii.    Bethlehem Elehssan Society;

xiii.   Young Muslim's Association in Hebron, aka Jam'iyyat al-Shubban al-Muslimin;

xiv.    Al-Ansar Charity;

xv.     Ramallah and al-Birah Charitable Committee or Society;

xvi.    Islamic Association (Gaza), aka Al Jamaya Al-Islamiya;

xvii.   Al Mujama Al-Islami;

xviii.  Islamic Charitable Society of Hebron, aka Al Jamiyah Al-Khiriah Al-Islamiyah;

---

[2] The website can also be found at www.palestine.info.info.

xix.    al-Bireh Al Islah Society; and

xx.    Bethlehem Orphan Care Society a/k/a Jami'yya Ri'aya al-yetim.

95.    Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee. It also has been involved in wiring money of the World Assembly of Muslim Youth, aka "WAMY," to HAMAS fronts when it knew WAMY had been outlawed by Israel for its terror financing.

96.    The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by the United States Department of Justice as HAMAS front organizations, and the management of each of these "charities" is in fact controlled by HAMAS operatives.

97.    The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but for its willful blindness should have been known to Defendant Arab Bank.

98.    Plaintiffs will show that these entities are the alter egos of HAMAS and knowingly act as agents for HAMAS, all of which is well known to Defendant Arab Bank, because, among other things:

a.    leaders and managers of the committees are HAMAS members;

b.    the Committees are connected to HAMAS military operations;

c.    The PA has identified the entities as HAMAS' entities;

d.    The Palestinian population considers the committees "to be HAMAS."

99.    Arab Bank has knowingly provided financial services to agents of HAMAS through the following accounts in the West Bank and Gaza Strip:

(1)   Tulkarem Charity Committee, a/k/a Lajna Zakat Tulkarem
      Account No. 9070-500010-6-510;

(2)   Tulkarem Charity Committee,
      Account No. 510/0/500010/970;

(3)   Tulkarem Charity Committee (Jordanian Dinar),
      Account No. 500/0/106500;

(4)   Tulkarem Charity Committee (Euro Account),
      Account No. 500010-6/596;

(5)   Charity Committee of Ramallah a/k/a Ramallah Zakat Committee,
      Account No. 510/0/610686;

(6)   Charity Committee of Ramallah,
      Account No. 510/0/610686-9030;

(7)   Charity Committee of Ramallah,
      Account No. 510/2/610686;

(8)   Nablus Zakat Committee,
      Account No. 500/0/400336-0193;

(9)   Islamic Charitable Society A1-Bireh,
      Account No. 510/7/602835;

(10)  Al-Mujama al-Islami,
      Account No. 6-5/500;

(11)  Al-Mujama al-Islami,
      Account No. 6-0/5 10;

(12)  Islamic Charity Society of Hebron,
      Account No. 510/0/9040-750049;

(13)  Islamic Charity Society of Hebron,
      Account No. 510/2/9030- 610686;

100.   In addition, Arab Bank knowingly maintained accounts for organizations

affiliated with terrorist organizations, including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | HAMAS |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | HAMAS |
| Nablus | 400336 | Nablus Islamic Aid Committee | HAMAS |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalgiliya | HAMAS |
| Tulkarem | 500010 | Tulkarem Charitable Society | HAMAS |
| Tulkarem | 503375 | Tulkarem Charitable Society | HAMAS |
| Nablus | 445444 | Al-Lod Charitable Society | HAMAS |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | HAMAS |

| | | | |
|---|---|---|---|
| Qalqiliya | 540939 | Qalqiliya Charitable Society | HAMAS |
| Nablus | 400739 | Tubas Charitable Society | HAMAS |
| Ramallah | 666473 | Jama'ah al-Islamiya | HAMAS |
| Al-Manara-Qalqiliya | 610686 | Ramallah Charitable Society | HAMAS |
| Al-Bireh | 649611 | A1-Bireh Al-Islah Society | HAMAS |
| Bethlehem | 717520 | Bethlehem Elehssan Society | HAMAS |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |
| Hebron | 760376 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 750049 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 751100 | Hebron Young Muslims' Society | HAMAS |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | HAMAS |
| Hebron | 751542 | Hebron Elehssan Society | HAMAS |
| Bethlehem | 711161 | Al-Islah Charitable Society | HAMAS |
| Al-Bireh | 609509 | Al-Huda Society — Ramallah | HAMAS |
| Gaza | 124109 | Central Islamic Society — Gaza Strip | HAMAS |
| Ramal | 100208 | Charitable and Children's Mercy Society — Gaza Sirip | HAMAS |
| Gaza | 10188 | House of the Qur'an and Sunnah Society | HAMAS |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | HAMAS |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | HAMAS |
| Gaza | 365459 | The Al-Nur Prisoner Society | HAMAS |
| Khan Yunis | 2001438 | Khan Ynnis Charity and Mercy Society | HAMAS |
| Gaza | 5858 | Nusseirat Islamic Society | HAMAS |
| Gaza | 150/3 | Khan Yunis Charitable Society | HAMAS |
| Gaza | 35287 | Gaza Charitable Society for the Sick | HAMAS |
| Gaza | 3155 | The Islamic University — Gaza | HAMAS |
| Khan Yunis | 200139 | Qararab Islamic Society | HAMAS |
| Gaza | 15115 | Jabalia Islamic Society | HAMAS |
| Rafah | 2036 | Rafah Islamic Society | HAMAS |
| Azariya | 302656 | Azariya Society for the Fostering of Women | HAMAS |
| Gaza | 39435 | Nur Al-Ma'rifah Society | HAMAS |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islmaic Jihad |

101.    U.S. Officials have told NBC News that bank regulators found that Arab Bank had as customers 40-60 suspected terrorists and groups allegedly associated with Al Queda, HAMAS and Hezbollah.  Officials told NBC that all had accounts with Arab Bank or moved terrorist monies through its New York office on Madison Avenue.

102.    The HAMAS charitable front, Al-Ansar Charity, maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

103.    The website further boasts that it has given money to Palestinians who were wounded, incarcerated or killed during the Intifada, including $6,000.00 to the family of the terrorist who murdered Malki and many others at the Sbarro pizzeria.

104.    The website of Al-Ansar shows the vital role of the Arab Bank:

> The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

105.    Al-Ansar maintains an account with the Arab Bank in Gaza.

106.    Arab Bank has also provided financial services to other terror organizations.  For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002, assault on the Hadera banquet hall.  Arab Bank is aware

that it provides financial services to the Al Aksa Martyrs Brigade (AAMB) and other PLO terrorist cells.

107.    Advertisements publicized throughout the Middle East call for donations to Arab Bank accounts to help support the Intifada.

108.    On October 3, 2000, during the early days of the Intifada, Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former HAMAS leader who was killed on March 22, 2004, was interviewed on 'Ala al-Hawaa' ["On the air"], a program that appears on Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia). The program showed a slide of the names of banks and account numbers where donations could be deposited for the Palestinians participating in the violent confrontation with Israel: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510

109.    The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served HAMAS) posted an announcement on May 3, 2004, condemning the Israeli Air Force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

110.    A HAMAS-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through terrorist organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP. The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon. Furthermore, the 101 Days Campaign published a request on its official website that visitors to its website donate to the organization through its accounts in any branch of the Arab Bank.

111.    Defendant Arab Bank has also knowingly laundered funds for HLF, a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS.

112.    HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

113.    The indictment specifies particular financial transactions initiated by HLF which resulted in monetary transfers to the Ramallah Charitable Committee.

114.    Over eight years ago, on May 6, 1997, the Government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ...."

115.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

116.    Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

117.    On January 10, 2001, a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was

killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

118.    Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the Boim case placed the defendant on further notice of HLF's criminal activities.

119.    Arab Bank provides financial services to agents of HAMAS by maintaining bank accounts for the following designated Foreign Terrorist Organizations affiliated with HAMAS:

    (1)    The Association de Secours Palestinien (ASP) —Arab Bank, Zurich;

    (2)    Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) -- Arab Bank, Paris; and

    (3)    Palestinian Association in Austria -- Arab Bank, Paris.

120.    Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee despite the fact that, in some cases, both the "donor" of the funds and the recipient had been previously formally designated as "Unlawful Organizations" by the Government of Israel.

121.    Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

122.    Nonetheless, Arab Bank and its New York branch continued to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank. NBC reporter Lisa Myers reported in a May 2005 broadcast that Israeli officials call the Arab Bank the "Grand

Central Station of Terrorist Financing." Yet, in order to fraudulently conceal its illegal role in terror financing, Arab Bank has falsely stated under oath that it enjoys a "good reputation" by regulators and banks in Israel.

123.    One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *fatwa* declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

124.    Arab Bank has also knowingly laundered funds for Interpal, a London based "charity" that has raised funds in Europe for HAMAS and other terrorists for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for Interpal through its New York branch to various HAMAS zakat committees. Arab Bank has also knowingly laundered and permitted the PIJ to solicit funds on its web site (www.Palestineway.com or www.abrarway.com) for its terrorist activities by sending money to various accounts maintained by Arab Bank. Often the account designated is one of the "charitable" front organizations. This demonstrates, among other things, the knowledge of the donors and the Arab Bank that the terror organizations using the "charitable" entities as fronts to try to mask the true nature of the money and Arab Bank's active participation in providing financial services in furtherance of the terrorists' scheme, design and plan. It is clear from the solicitation that money is being sought for military uses and jihad and not humanitarian uses. Arab Bank knows of these solicitations or is willfully blind to them because of its intent and desire to see the goals of jihad succeed, and its complicity in providing financial services and material support to the terrorists, their organizations and their fronts and families.

125.    The financial support provided by the Saudi Committee, Interpal and Holy Land Foundation via the Arab Bank, as well as the Arab Bank accounts maintained by HAMAS' "charitable" fronts constitutes the backbone of the donor base and operational budgets of HAMAS, and has allowed HAMAS to expand its operations, attract more recruits, and professionalize its financial distribution channels.

126.    By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and other terrorist organizations in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism and has committed numerous overt acts in furtherance of the conspiracy.  Plaintiffs allege that Arab Bank has acted with knowledge and intent to materially assist and support HAMAS and other terror organizations in this way.  This wrongful conduct was approved and ratified by senior executives of the bank and by management level employees of the Defendant.

127.    Indeed, had the doors of Arab Bank not been opened to HAMAS and its fundraisers and "charitable" front organizations during the past four years, the leaders of HAMAS would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

128.    A bank that knowingly provides material support of this kind, directly or indirectly, to a designated international terror organization such as HAMAS is secondarily liable for all of the foreseeable acts committed by the terror organization.  Arab Bank is therefore vicariously or secondarily liable for the wrongful death of Malka Chana Roth.  That murder was

committed by HAMAS because of the Bank's persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Malka's murder by HAMAS on August 9, 2001.

### ARAB BANK'S FRAUDULENT
### CONCEALMENT OF ITS ILLICIT CONDUCT

129.    Throughout the course of the Second Intifada, Arab Bank has made substantial efforts to conceal its participation in the illicit financing of terrorism and other misconduct alleged by Plaintiffs. Those efforts at concealing the Bank's participation in terrorism financing were necessitated by the fact that the Bank is a highly regulated financial institution with substantial assets. Thus, it was necessary for Arab Bank to conceal its misconduct both from potential claimants and the government bodies that regulate the Bank's conduct.

130.    For example, while Arab Bank has made numerous transfers from various Arab Bank accounts to accounts controlled by terrorist fronts, Arab Bank has not reported those transfers to criminal authorities, as was required by law at the time those transfers were made. Nor has the Bank made public its support of terrorist front organizations.

131.    Arab Bank has also attempted to conceal its participation in the financing of terrorism by refusing to allow the Saudi Committee and other sponsors of terrorism to locate their offices at Arab Bank facilities although the Bank has supplied material support for those organizations. Arab Bank has also, from time to time, caused its name to be omitted from various Web site solicitations for funds to finance terrorism in the Middle East. It has also tried to hide its role in the conspiracy by using its foreign branches and affiliates in countries or areas that the Bank knows will use bank secrecy laws to conceal information about its customers.

132.    Plaintiffs made reasonable efforts to determine the identities of those involved in the attacks that injured them. Until recently, however, it was impossible for Plaintiffs to

determine that Arab Bank had actively and intentionally participated in the wrongdoing alleged herein.

133.    Indeed, until recently, Arab Bank's illicit conduct remained unknown to American banking regulators, although those regulators had access to Arab Bank's records. Until the OCC action against Arab Bank was published in February 2005 (see ¶ 15 above), Arab Bank falsely and fraudulently claimed that Arab Bank was "truthful to its tradition and high level of ethics" that it "earned the respect . . .of the entire banking community," that "the [Arab Bank] is at the forefront of preventing money-laundering and terrorist financing," that it "applies the strictest of the rules" of the regulators and is "highly regarded by the various regulatory bodies."

134.    Furthermore, much of the information upon which Plaintiffs' claims are based was uncovered only in connection with the seizure of records belonging to Arab Bank and others by Israeli defense forces.  It was not possible for Plaintiffs to uncover that information until shortly before they asserted their claims.

135.    Thus, Plaintiffs undertook reasonable efforts to discover their claims against Arab Bank but were prevented from doing so until shortly before they initiated this action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### AIDING AND ABETTING THE MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333

136.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

137.    Plaintiffs have been injured by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the

United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens, as set forth in 18 U.S.C. § 2332.

138.    The acts of the Palestinian terrorists in killing Malki Roth and other persons as described herein were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel, and the government of the United States, by intimidation or coercion, and (c) to affect the conduct of the government of Israel, and the government of the United States, by mass destruction and murder.    Arab Bank could reasonably foresee such acts would occur as a result of the Bank's provision of material support to HAMAS and its alter egos from the fall of 2000 forward.

139.    The acts of terrorism that are the subject of this action were extreme and outrageous and were committed with the intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

140.    Arab Bank has provided extraordinary financial and administrative services to terrorists, their families, and terrorist organizations, including HAMAS, which is responsible for the attack that killed Malki Roth.    The actions of Arab Bank provide substantial assistance to and help to HAMAS and others in recruiting and incentivizing terrorists.    Because money is fungible, Arab Bank's actions have also freed up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the Plaintiffs.

141.    Arab Bank knows, or has recklessly disregarded, that it is providing material support for acts of international terrorism by HAMAS and other terror groups, as is evidenced by

its close contact with the Saudi Committee, its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers, as set forth above. Arab Bank is thus providing HAMAS and other terror groups with material support for their terrorist activities. When Arab Bank did so, it knew about HAMAS' and the other terror groups' illegal activities, desired to help those activities succeed, and took affirmative steps to assist the accomplishment of those objectives. The death of Malki Roth, and the death and injuries suffered by scores of other HAMAS terror victims since at least October 2000, were the reasonably foreseeable consequences of Arab Bank's conspiracy with and knowing provision of material assistance to HAMAS and the Saudi Committee.

142.    Because it has aided and abetted violations of 18 U.S.C. § 2332 that caused the death of Malki Roth and caused the other Plaintiffs to be injured, Arab Bank is jointly, severally and vicariously or secondarily liable pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs sustained.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

143.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

144.    Plaintiffs have been injured in their person by reason of acts committed by Palestinian terrorists that involved murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens set forth in 18 U.S.C. § 2332.

145.    The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel and of the United States by intimidation or coercion, and (c) to affect the conduct of the government of Israel and of the United States by mass destruction and murder.

146.    The act of terrorism that is the subject of this action was extreme and outrageous and was committed with the intention to cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

147.    Arab Bank knowingly formulated and joined a conspiracy, agreed to combine with other persons to act unlawfully in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy. Plaintiffs have suffered death, harm and loss by reason of such conspiracy.

148.    Pursuant to a common scheme to encourage and incentivize acts of terrorism, Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS and other terrorist organizations knowing and intending that such services would facilitate the activities of those organizations and support terrorist activities. Arab Bank's actions, in fact, facilitated the conspiratorial scheme because, as set forth more fully above, but for the actions of Arab Bank, the funding of the universal coverage death and dismemberment benefit plans for terrorists and their families would have been substantially more difficult, if not impossible, to implement. Arab Bank has acted in concert with others, as described herein, to commit illegal acts as part of its agreement to inflict

injuries upon and cause the murder of civilians. Arab Bank has intentionally committed numerous overt acts in furtherance of this illegal conspiracy.

149. Arab Bank is therefore liable for the wrongful death of Malki Roth. That murder was committed by HAMAS because of the Bank's persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Malki's murder by HAMAS on August 9, 2001 pursuant to the conspiracy in which Arab Bank knowingly participated.

150. Because Arab Bank conspired with the Saudi Committee, HAMAS, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured the Plaintiffs, Arab Bank is jointly and severally liable to Plaintiffs pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs sustained.

### THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

151. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

152. By serving as the exclusive administrator of universal coverage "insurance" to the families of suicide bombers and other terrorists and performing the other extraordinary financial and administrative services that Arab Bank knowingly provided to HAMAS, HAMAS terrorists, their families, and HAMAS alter egos (including "charitable organizations" affiliated with and controlled by HAMAS), Arab Bank has provided material support to, and incentives and rewards for, the preparation and carrying out of numerous acts of international terrorism that have caused the death of Malki Roth and injury to the Plaintiffs.

153. A bank that knowingly provides material support of this kind, directly or indirectly, to an international terror organization such as HAMAS is vicariously or secondarily

liable for all of the foreseeable acts committed by the terror organization. Arab Bank is therefore vicariously or secondarily liable for the murder of Malki Roth. That murder was committed by HAMAS because of the Bank's persistent, knowing, and active material support of HAMAS from at least the Fall of 2000 through and after Malka's murder by HAMAS on August 9, 2001.

154.    Because Arab Bank participated in the commission of violations of 18 U.S.C. § 2339A that have caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for all damages that Plaintiffs have sustained as a result of such injuries.

### FOURTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333

155.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

156.    By knowingly transferring funds from and to agents of HAMAS, including the Holy Land Foundation, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, Defendant Arab Bank's New York and other branch offices have provided material support to a Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(b).

157.    Based on the defendant's level of sophistication and status as a federally regulated financial institution in the United States, Defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization. A bank that knowingly provides material support, directly or indirectly, to a designated international terror organization such as HAMAS is liable for all of the foreseeable acts committed by the terror organization. Arab Bank is therefore liable for the

murder of Malki Roth. That murder was committed by HAMAS because of the Bank's persistent, knowing and active material support of HAMAS from at least the Fall of 2000 through and after Malka's murder by HAMAS on August 9, 2001.

158. Because it knowingly provided material support to a Foreign Terrorist Organization, Arab Bank is therefore civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333.

### FIFTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333

159. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

160. The financial services that Arab Bank has willfully and unlawfully provided to and for HAMAS and the Saudi Committee include the collection and transmission of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

161. The acts committed against the Plaintiffs were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel and the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of Israel and the government of the United States by mass destruction and murder.

162. As set forth more fully above, but for the assistance, material support and financial services provided by Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement. A bank that knowingly provides material support of

this kind, directly or indirectly, to an international terror organization such as HAMAS is liable for all of the foreseeable acts committed by the terror organization. Arab Bank is therefore liable for the murder of Malki Roth. That murder was committed by HAMAS because of the Bank's persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Malki Roth's murder by HAMAS on August 9, 2001.

163.    Because it has willfully violated 18 U.S.C. § 2339C, by a variety of means, direct and indirect, as described herein, Arab Bank is liable to the Plaintiffs, who have suffered injuries to their person by reason of such acts under 18 U.S.C. § 2333.

## SIXTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

164.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

165.    The acts of terrorism that are the subject of this action were committed with the intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts, or were done with reckless indifference to the likelihood that such behavior would cause such severe emotional distress and with utter disregard for the consequences of such actions.

166.    Any person or organization that knowingly provides material support, directly or indirectly, to a designated international terror organization such as HAMAS is vicariously or secondarily liable for all of the foreseeable acts committed by the terror organization. Arab Bank is therefore  liable for the murder of Malka Ann Roth and the tort of intentional infliction of emotional distress. Those unlawful acts were committed by HAMAS because of Arab Bank's

persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Malki's murder by HAMAS on August 9, 2001.

167.    The conduct of Arab Bank that aided and abetted the attack that killed Malka Roth was unreasonable and outrageous, exceeded the bounds usually tolerated by decent society, and was undertaken willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiffs severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

168.    As a direct, foreseeable and proximate result of the conduct of Defendant Arab Bank as alleged above, Plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

169.    Arab Bank's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiffs' rights.  As a direct, foreseeable and proximate result of those actions, Plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, and Plaintiffs therefore seek punitive damages in an amount sufficient to deter Arab Bank and others from committing similar future wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

   a)  Accept jurisdiction over this action;

   b)  Enter judgment against Arab Bank and in favor of Plaintiffs for all compensatory and other damages in such amounts for each named Plaintiff as are allowed by applicable law and as shall be determined at trial;

c) Enter judgment against Arab Bank and in favor of Plaintiffs for treble damages of each amount awarded pursuant to the previous prayer for relief, and pursuant to 18 U.S.C. § 2333;

d) Enter judgment against Arab Bank and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e) Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

f) Grant such other and further relief as the interests of justice may require, including leave to amend this complaint so as to permit justice to be served on behalf of Plaintiffs against the Defendant and any other parties as may hereafter be named in this action.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  August 5, 2005
      New York, New York         **SHALOV STONE & BONNER LLP**

                        By: _____
                        Lee S. Shalov (LS-7118
                        James P. Bonner (JB-0629)
                        485 Seventh Avenue, Suite 1000
                        New York, New York 10018
                        (212) 239-4340

                        Attorneys for Plaintiffs

Of Counsel:

**SAYLES WERBNER P.C.**
Mark S. Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700


**HEIDEMAN  NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818


**HARRY REICHER**
Barristers Chambers
1336 50th Street
Brooklyn, NY 11219
(718)854-0001

**PERLES LAW FIRM, P.C.**
Steven R. Perles
*(pro hac vice motion to be filed)*
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 955-9055

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas  77380
(281) 296-9090